**INTERNATIONAL BUSINESS LISTS, INC., Plaintiff–Appellant, Cross–Appellee,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH CO., Defendant–Appellee, Cross–Appellant.**

Nos. 97–2949, 97–3109.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1998.

Decided June 26, 1998.

Michael D. Sher (argued), John W. Guarisco, Neal, Gerber & Eisenberg, Chicago, IL, for Plaintiff–Appellant in No. 97-2949.

James H. Bowhay, Figliulo & Bowhay, Chicago, IL, Michael D. Sher (argued), Neal, Gerber & Eisenberg, Chicago, IL, for Plaintiff–Appellant in No. 97-3109.

William F. DeYoung (argued), Burke, Weaver & Prell, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and RIPPLE and KANNE, Circuit Judges.

KANNE, *Circuit Judge.*

In this breach of contract action, International Business Lists, Inc. and American Telephone and Telegraph Co. ("AT&T") each claim the other violated the terms of a direct marketing service agreement ("Agreement"). The district court granted summary judgment against International Business Lists for its claim and against AT&T for its counterclaim, reasoning that the Agreement's one year limitations provision barred both causes of action. We affirm.

## I. HISTORY

International Business Lists is an Illinois corporation that compiles and develops business databases and provides various computer-related marketing and informational services to its customers. AT&T is a New York corporation which sold telecommunication equipment. In June 1990, International Business Lists and AT&T entered into an Agreement in which AT&T agreed to purchase certain direct marketing services from International Business Lists. The Agreement was for a term of two years, and it is governed by and construed in accordance with Illinois law.

### A.

Gary Walter, the president of International Business Lists, negotiated the terms of the Agreement with John Winters of AT&T. The Agreement states that "AT&T at its election may select the services below at the prices set forth." The Agreement then provides the services available: the construction of a prospect database, access to the North American Business Registry, the generation of leads for telephone voice systems and fax equipment, and production of mailing labels. Under the definition provided in the Agreement, "leads" are businesses that have indicated that they will definitely, probably, or maybe purchase or lease fax or telephone voice systems in the near future.

Despite the Agreement's provision allowing AT&T to select what services it wants, the Agreement provides a ramp-up schedule listing an increasing number of leads per month that International Business Lists would give AT&T. This schedule begins in May 1990 with 3,000 leads and stops in December 1990 with 11,000. The Agreement does not state whether International Business Lists must provide and AT&T must

purchase 11,000 leads each month for the remaining length of the Agreement. The Agreement does contain an early termination provision which allows AT&T to cancel it by giving ninety days written notice and paying a penalty of at least $150,000 and up to $200,000 per year, depending on the remaining duration of the Agreement. Finally, it includes a limitation of actions provision which states:

> No action, regardless of form, arising out of the services under this Agreement, may be brought by either party more than one (1) year after the cause of action has accrued, except tha[t] an action for nonpayment may be brought within one (1) year of the date of the last payment.

Agreement ¶ 5.

### B.

On May 23, 1991, AT&T informed International Business Lists that as of May 31, 1991 it wanted to reduce the nature and scope of the services which International Business Lists provided under the Agreement, but it did not wish to terminate its contractual relationship with International Business Lists. AT&T did not believe the reduction in services to be a termination of the contract because, in its view, the contract did not prohibit a reduction in services from time to time and does not require maintenance of prescribed levels of services or dollar amounts. AT&T specifically did not want to purchase any more leads or other market survey data, but it did want access to the North American Business Registry.

Shortly after AT&T headquarters decided to stop purchasing leads, International Business Lists began contacting AT&T's branch offices directly to sell leads to them. According to International Business Lists, Winters provided International Business Lists with a list of AT&T's branch offices that received International Business Lists' leads and permitted International Business Lists to pursue business with the branches.

On July 18, 1991, Winters sent a letter to AT&T's branch general managers, lead generation managers, and its market analysts about International Business Lists' contacts. In the letter, Winters stressed that AT&T has in place national service agreements with International Business Lists and other list vendors through June 1992 to obtain leads, records, and processing at competitive rates. Winters viewed the Agreement as precluding any need to negotiate individual local agreements. Winters reinforced that message in a letter dated August 2, 1991, which advised the branches that they should consider that AT&T has existing agreements in place for this type of work if they were to purchase leads directly from International Business Lists or any other source. Finally, on August 7, 1991, Winter encouraged the branches to use International Business Lists if a branch believed that International Business Lists could help it generate leads for its territory and that International Business Lists could do this job in a cost-effective manner.

This continuation of their business relationship caused both parties some confusion over the state of the Agreement. On August 2, 1991, Winters sent a letter to International Business Lists contending that AT&T did not terminate the Agreement but merely reduced the level of services required. AT&T believed that it did not breach the Agreement by not purchasing 11,000 leads each month because it claimed that the Agreement did not contain a minimum quantity term. The letter also claimed that although Winters permitted International Business Lists to contact the branches, Winters was not aware that International Business Lists would attempt to circumvent the Agreement and sell leads at a 50% premium. In a written response, International Business Lists stated that it believed that AT&T had breached the Agreement and that whatever lead generation business International Business Lists developed with the branches would be an offset to the cancellation fee AT&T owed International Business Lists under the Agreement. International Business Lists also explained that the price increase was the result of the branches' request of voice leads only and the higher cost of filling these orders for the smaller locations.

Finally, on December 17, 1991, International Business Lists circulated a bulletin to AT&T's branches that "voice leads only"

were available through a national program. One term of this bulletin stated that the "National Agreement" contained a volume discount such that 0 to 500 leads per month would cost $25 each, 501 to 2000 would cost $24 each, 2,001 to 5,999 would cost $23 each, and over 6,000 leads would be $22 each. A response slip provided four options for the number of leads a branch may request: 200, 300, 500, and other. The bulletin also explained that participation in this program was optional, that a branch would begin receiving leads approximately five working days after it "initiated" an agreement with International Business Lists, that the program ran on a month to month basis, and that either party could cancel the program.

Between October 1991 and May 1992, International Business Lists sold AT&T approximately 3,855 voice leads for $24 per lead. In May 1992, International Business Lists stopped selling leads to AT&T's branches.

### C.

On August 31, 1992, International Business Lists filed a complaint against AT&T for breach of the Agreement. After a series of motions not relevant to this appeal, AT&T filed a counterclaim for breach of the Agreement for International Business Lists' failure to produce "qualified" leads. International Business Lists then amended its complaint twice to state that AT&T did not comply with the Agreement's termination provision and breached the Agreement by not purchasing a minimum monthly quantity of leads and not purchasing other market survey data as the Agreement required.

On July 9, 1993, AT&T filed a motion to dismiss International Business Lists' complaint for failure to state a claim based on the one year limitation provision in the Agreement. According to AT&T, it last purchased services under the Agreement in July 1991 at the very latest. Since International Business Lists did not initiate its suit until August 31, 1992, AT&T claimed the suit was not brought within the limitations period. On November 5, 1993, the district court granted AT&T's motion to dismiss the second amended complaint as time barred. *See International*

*Bus. Lists, Ltd. v. American Tel. & Tel. Co.*, No. 92 C 5844, slip op. at 4–5, 1993 WL 462844 (N.D.Ill. Nov. 8, 1993).

International Business Lists moved for reconsideration of that decision on December 1, 1993, arguing that the second amended complaint suggested that a series of partial breaches occurred, instead of a single breach. The court granted International Business Lists' motion in part on June 16, 1994. *See International Bus. Lists, Ltd. v. American Tel. & Tel. Co.*, No. 92 C 5844, slip op. at 9, 1997 WL 337221 (N.D.Ill. Jun. 16, 1994). The court held that International Business Lists sufficiently alleged a multiple breach theory, and it reinstated any claims which International Business Lists had from September 1, 1991 to May 31, 1992. *See id.* at 8–9.

On August 18, 1994, International Business Lists moved for partial summary judgment on AT&T's counterclaim arguing that the Agreement's limitation provision should apply to both parties. International Business Lists argued that AT&T did not file its counterclaim until March 8, 1993, and thus the Agreement's one year limitations provision barred any claims that arose before March 8, 1992. The district court granted this motion on November 30, 1994, holding that AT&T's counterclaims fell within the scope of the Agreement's limitation provision and that the provision barred AT&T from asserting any counterclaims that arose before March 8, 1992.

AT&T then filed a motion for summary judgment on August 23, 1995. It contended that discovery disproved International Business Lists' continuing breach theory and that the Agreement's one year limitation provision barred International Business Lists' claim. According to AT&T, any activity between itself and International Business Lists during the year before International Business Lists filed its complaint was not done pursuant to the Agreement. AT&T argued that the bulletin was evidence of a completely different program. On January 9, 1996, International Business Lists filed its response brief and attached an affidavit from Walter which stated that the Agreement was modi-

fied after May 31, 1991 and that AT&T's purchases during the year before it filed the complaint were done under the modified Agreement.

On August 22, 1996, the district court granted AT & T's motion for summary judgment. The differences between the Agreement and the bulletin persuaded the court that no reasonable juror could conclude that any quantity requirement, if any ever existed in the Agreement, survived the new arrangement. *See International Bus. Lists, Ltd. v. American Tel. & Tel. Co.*, No. 92 C 5844, slip op. at 9, 1996 WL 490712 (N.D.Ill. Aug. 26, 1996). Thus, the district court held that the suit was time barred, regardless of whether International Business Lists characterized the bulletin as a modification of the Agreement or as a new contract. *See id.*

After unsuccessfully attempting to appeal this determination, International Business Lists moved for summary judgment on AT&T's counterclaim for damages after March 8, 1992. On July 14, 1997, the district court granted International Business Lists' motion, holding that the Agreement's limitations provision barred AT&T's counterclaim. *See International Bus. Lists, Ltd. v. American Tel. & Tel. Co.*, No. 92 C 5844, slip op. at 1, 1997 WL 414109 (N.D.Ill. Jul. 17, 1997).

International Business Lists appeals and AT&T cross-appeals.

## II. ANALYSIS

### A.

We review a district court's grant of summary judgment *de novo*, drawing our own conclusions of law and fact from the record before us. *See Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir.1997). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, neither "the mere existence of *some* alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat a motion for summary judgment.

### B.

International Business Lists contends that summary judgment was inappropriate because triable issues of fact exist over whether it can recover for AT&T's alleged breach of the Agreement as modified. The district court rejected this argument, reasoning that even if the court accepted International Business Lists' characterization of the bulletin as a modification of the Agreement no reasonable juror could conclude that any minimum monthly quantity term survived the new arrangement.

International Business Lists asserts on appeal that its bulletin to AT&T's branches on December 17, 1991 modified the Agreement and incorporated the Agreement's implied minimum quantity term of 11,000 leads per month. Because AT&T did not purchase this monthly minimum from September 1991 to May 1992, International Business Lists believes that it has a breach of contract claim for each month that AT&T's branches purchased some leads but did not meet the 11,000 floor. Thus, it argues that the Agreement's limitation provision does not bar its claims.

AT&T responds that any business between International Business Lists and AT&T's branches was separate from the Agreement between International Business Lists and AT&T headquarters and that the Agreement's limitation provision bars International Business Lists' breach of contract claim. According to AT&T, the contractual limitation prevents International Business Lists' claim

because International Business Lists did not file its complaint until August 31, 1992 and it is undisputed that AT&T headquarters did not purchase any leads after July 1991 at the latest. AT&T contends that the district court correctly granted its summary judgment motion because International Business Lists has not presented evidence that a modification occurred and that any modification incorporated this minimum monthly quantity term.

 A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed. *See Downers Grove Assocs. v. Red Robin Int'l, Inc.,* 104 Ill.Dec. 393, 151 Ill.App.3d 310, 502 N.E.2d 1053, 1060 (Ill.App.Ct.1986); *Hartwig Transit, Inc. v. Menolascino,* 113 Ill.App.3d 165, 68 Ill.Dec. 796, 446 N.E.2d 1193, 1197 (1983); *see also Chicago College of Osteopathic Med. v. George A. Fuller Co.,* 776 F.2d 198, 208 (7th Cir.1985). A valid modification must satisfy all the criteria essential for a valid contract: offer, acceptance, and consideration. *See Doyle v. Holy Cross Hosp.,* 289 Ill.App.3d 75, 224 Ill.Dec. 507, 682 N.E.2d 68, 71 (1997); *Bass v. Prime Cable of Chicago, Inc.,* 284 Ill.App.3d 116, 220 Ill.Dec. 772, 674 N.E.2d 43, 51 (1996); *Scutt v. LaSalle County Bd.,* 97 Ill.App.3d 181, 53 Ill.Dec. 21, 423 N.E.2d 213, 216–17 (1981); *see also Robinson v. Ada S. McKinley Community Servs., Inc.,* 19 F.3d 359, 364 (7th Cir.1994). A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance. *See Maher & Assocs., Inc. v. Quality Cabinets,* 267 Ill.App.3d 69, 203 Ill.Dec. 850, 640 N.E.2d 1000, 1007 (1994); *Corrugated Metals, Inc. v. Industrial Comm'n,* 184 Ill. App.3d 549, 132 Ill.Dec. 739, 540 N.E.2d 479 (1989).

 To succeed in its breach of contract claim, International Business Lists must establish that 1) the Agreement contains an implied minimum quantity term; 2) neither party breached the Agreement before International Business Lists attempted to modify the Agreement; 3) AT&T and International Business Lists agreed to modify the Agreement; 4) International Business Lists' December 17, 1991 bulletin to AT&T's branches contains the terms of the modified Agreement; 5) the modified Agreement either explicitly or implicitly has a minimum quantity term; and 6) AT&T breached the modified Agreement within the year before International Business Lists filed its complaint. To defeat AT&T's motion for summary judgment, International Business Lists must show that at least a genuine issue of material fact exists for each of these elements. *See* Fed.R.Civ.P. 56(c).

*Even if* we assume that a minimum quantity term of 11,000 leads per month exists in the Agreement and *even if* we assume that the purchasing of leads by AT&T's branches was a course of conduct consistent with AT&T's acceptance of the bulletin's terms such that AT&T acquiesced to a modification of the Agreement, International Business Lists has not presented any evidence to suggest that a minimum quantity term exists in the bulletin or was carried over from the Agreement to the modified Agreement. The bulletin only twice addresses the quantity of leads available. In describing a volume discount for purchasing leads, the bulletin lists four prices. The first states that the price is $25 per lead if a branch purchases 0 to 500 leads. This volume discount suggests a branch may purchase any number of leads, including zero. The second place where quantity is mentioned is in the response form where the options for ordering leads are 200, 300, 500, or other. Neither of these terms suggests a minimum quantity that AT&T must purchase. Moreover, there is no provision requiring AT&T to monitor its branches' purchases to ensure that it meets a quota of 11,000 leads per month. It is wholly inconsistent for an implied minimum quantity term to exist when the bulletin states that participating in the program is optional, no explicit minimum quantity is required in the response list, each branch must "initiate" its own agreement with International Business Lists, and the program runs on a month to month basis. These facts lead us to conclude that the structure of the bulletin precludes the existence of a minimum quantity term

even if such a term was implicit in the Agreement and that no reasonable jury could decide otherwise. Without an explicit or implicit minimum quantity term, International Business Lists cannot maintain a breach of contract claim against AT&T.

As support for its contention that it merits a trial, International Business Lists highlights three writings from AT&T's Winters and one statement from International Business Lists' Walter that evidence material issues of fact which a trier of fact must resolve. The first is a memorandum to AT&T's branches dated July 18, 1991, stressing that AT&T has national service agreements in place with International Business Lists and other list vendors through June 1992. The second is Winters' August 2, 1991 letter to International Business Lists' president reinforcing AT&T's position that it has not terminated its Agreement with International Business Lists. The third is another memorandum to the branches stating that Winters was willing to help them price the purchasing of leads based on the existing arrangement. The final piece of evidence is Walter's affidavit that Winters approved the bulletin before International Business Lists distributed it to the branches, insisted that it be titled "voice leads available only through national program," and noted the cumulative nature of pricing in the bulletin.

These statements do not aid International Business Lists in establishing that the *modified* Agreement incorporated an implied minimum quantity term. These statements address whether the Agreement was viable after AT&T headquarters said it did not want to purchase any more leads and whether AT&T acquiesced to International Business Lists' modification of the Agreement. Even if we assume that the Agreement was viable and that AT&T acquiesced to International Business Lists' modification, International Business Lists' suit does not merit a trial unless a genuine issue of material fact exists for the trier of fact to resolve. These statements do not address the material issue of whether any evidence exists suggesting a minimum quantity term carried over from the Agreement to the modified Agreement. Without a minimum quantity term, Interna-

tional Business Lists cannot maintain its breach of contract claim. Because we find no evidence supporting International Business Lists in this contention, the district court did not err in granting AT&T's motion for summary judgment.

### C.

In its cross-appeal, AT&T challenges the district court's November 30, 1994 order in which it held that the Agreement's one year limitation provision barred any counterclaim for damages incurred more than one year before AT&T filed its counterclaim. However, AT&T does not wish to pursue the counterclaim independent of International Business Lists' breach of contract claim. See Cross Appellant Br. at 17, 32 n. 7. AT&T does not pursue its counterclaim independently, we affirm the district court's dismissal of AT&T's counterclaim.

For the foregoing reasons, we AFFIRM the judgment of the district court.