**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

In re:                              )     BAP No. HI-17-1066-LBTa
                                    )     BAP No. HI-17-1137-LBTa
YOUNG HUI KIM,                      )     (related appeals)
                                    )
                 Debtor.            )     Bk. No. 14-01353
_____)
                                    )     Adv. No. 15-90001
YOUNG HUI KIM; GLORY OF GOD         )
PRESBYTERIAN CHURCH;                )
PACIFIC EAGLE REALTY LLC,           )
                                    )
                 Appellants,        )
                                    )
v.                                  )     **M E M O R A N D U M***
                                    )
JULIA RIIHIMAKI,                    )
                                    )
                 Appellee.          )
_____)

Argued and Submitted on October 26, 2017
at Honolulu, Hawaii

Filed - November 21, 2017

Appeal from the United States Bankruptcy Court
for the District of Hawaii

Honorable Robert J. Faris, Chief Bankruptcy Judge, Presiding

————————————————

Appearances:    Christopher James Muzzi of Mosely Biehl Tsugawa
                Lau & Muzzi argued for Appellants; Ronald K.K.
                Sakimura argued for Appellee.

————————————————

Before: LAFFERTY, BRAND, and TAYLOR, Bankruptcy Judges.

---

*This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Appellee moved to enforce an agreement to settle her nondischargeability claims and Appellants' counterclaims. Appellants contended that there was no enforceable settlement agreement because Appellant Young Hui Kim ("Reverend Kim") had not provided written authorization for her attorney to settle the matter, as required under Hawaii law. After a five-day evidentiary hearing, the bankruptcy court found that although Reverend Kim had not provided written authorization to settle, she had ratified the settlement by failing to raise her objections within a reasonable time. The bankruptcy court thus granted the motion to enforce. The bankruptcy court also granted Appellee's motion for attorney's fees. Appellants timely appealed both orders. We AFFIRM both orders.

**FACTS**

Reverend Kim is a licensed real estate broker and the owner of Appellant Pacific Eagle Realty LLC ("Realty"); she is also owner and pastor of Appellant Glory of God Presbyterian Church ("Church"). Pre-petition, the parties to this appeal were involved in litigation in Hawaii state court. That litigation commenced in February 2011 when Appellee Julia Riihimaki filed a lawsuit against Reverend Kim to recover money that Reverend Kim allegedly swindled from Ms. Riihimaki through a number of real estate transactions and monetary advances. Reverend Kim filed a counterclaim. Less than two months later, the parties settled and dismissed their respective claims. Reverend Kim did not follow through with the settlement; instead, in June 2011 she filed a complaint against Ms. Riihimaki in state court asserting

-2-

claims that were substantially identical to those alleged in her counterclaim in the first litigation. Ms. Riihimaki filed a counterclaim; she also filed a complaint against Reverend Kim and Realty in the Hawaii Regulated Industries Complaints Office ("HRICO").

The second state court action was stayed when Reverend Kim filed a chapter 7[1] petition on October 8, 2014. Ms. Riihimaki filed a timely complaint against Appellants and others, alleging essentially the same conduct alleged in the first state court action and seeking a declaration of nondischargeability under §§ 523(a)(2), (4) and (6). Ms. Riihimaki alleged that the debt owed to her by Reverend Kim was not dischargeable because Reverend Kim, while acting as Ms. Riihimaki's real estate agent, had cheated her out of money and property by false pretenses, false representations, and fraud. Reverend Kim filed a counterclaim against Ms. Riihimaki that was similar to her counterclaim in the first state court action and her complaint in the second state court action (seeking compensatory and punitive damages for breach of contract and unjust enrichment or rescission of a transfer of real property from Reverend Kim to Ms. Riihimaki).

Reverend Kim was originally represented in her bankruptcy case by attorney Gregory T. Dunn; attorney Jean Christensen represented Reverend Kim, the Church, and Realty in the Riihimaki

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "LBR" references are to the Local Bankruptcy Rules for the District of Hawaii.

adversary proceeding. Ms. Christensen and Ms. Riihimaki's counsel – Ronald Sakimura and Ronald Ogomori – began discussing settlement early on. Reverend Kim was incentivized to settle because (i) she lacked sufficient funds to pay defense counsel; (ii) Ms. Riihimaki had sued some of Reverend Kim's relatives and business associates, and Reverend Kim did not want the litigation to affect those people; (iii) the litigation was preventing Reverend Kim from focusing on her ministry; and (iv) Reverend Kim risked losing her real estate license if Ms. Riihimaki proved that Reverend Kim had committed fraud.

On July 17, 2015, Ms. Christensen sent a settlement proposal to Mr. Ogomori and Mr. Sakimura. On July 31, 2015, Mr. Ogomori responded with a counteroffer (the "Counteroffer"). Among the terms of the Counteroffer were: (1) Reverend Kim would stipulate to a judgment against her, the Church, and Realty, in the amount of $1,350,000, $650,000 of which would be nondischargeable under § 523, to be paid over a specified schedule; (2) Ms. Riihimaki would file a proof of claim for the full judgment amount in Reverend Kim's bankruptcy case, and any recovery on that claim in excess of $7,500 would be applied to the nondischargeable portion of the judgment; (3) defendants would make two cash payments of $30,000 and $28,450.43[2] that would not be credited to the judgment; (4) any proceeds received by Ms. Riihimaki from certain real property, net of expenses outlined in the Counteroffer, would be applied to the nondischargeable portion of the judgment;

---

[2]The $28,450.43 represented a discovery sanction that had been imposed against Reverend Kim in the state court litigation.

(5) the pending state court action, the adversary proceeding, and the complaint filed in the HRICO would be dismissed with prejudice and all claims released, subject to specified conditions precedent; (6) the settlement agreement would not be construed as an admission by Reverend Kim, the Church, or Realty of liability in the adversary proceeding; and (7) the settlement agreement would be subject to review by Reverend Kim's bankruptcy trustee and the approval of the bankruptcy court.

On August 20, 2015, Ms. Christensen emailed Mr. Ogomori and Mr. Sakimura stating that the terms of the Counteroffer were acceptable to her clients. Thereafter, counsel for each side worked on the specific language to be included in a written agreement, and Ms. Christensen met with Reverend Kim several times to discuss the settlement terms; at no time during those discussions did Reverend Kim object to the settlement. In late September 2015, Ms. Christensen presented Reverend Kim with a final version of the settlement agreement (the "Draft Settlement Agreement"). The Draft Settlement Agreement contained some terms that were materially different from those contained in the Counteroffer. Reverend Kim refused to sign the Draft Settlement Agreement. Ms. Christensen thereafter withdrew from representing Reverend Kim; attorney Christopher Muzzi substituted in as counsel for Appellants in the adversary proceeding and for Reverend Kim in the main case.

On November 5, 2015, Ms. Riihimaki filed a motion to enforce the settlement. Appellants opposed the motion to enforce, arguing that Ms. Christensen did not have written authority to settle the adversary proceeding and that Reverend Kim had not

-5-

ratified the settlement.

The bankruptcy court held an evidentiary hearing over several days in late 2016. Reverend Kim, Ms. Christensen, Gregory Dunn, and Francene Dunn, Gregory Dunn's wife and legal assistant, testified regarding meetings at which they were present when settlement terms were discussed. Ms. Christensen testified that she believed Reverend Kim had authorized her to accept the terms of the Counteroffer. Reverend Kim testified that she never saw any settlement proposals and had not agreed to any settlement. Nevertheless, based on trial testimony, exhibits, and credibility determinations, the bankruptcy court found that:

> After months of discussion, Reverend Kim orally authorized Ms. Christensen to send a written settlement offer to Ms. Riihimaki's counsel. Reverend Kim understood and approved all of the terms of the offer. Ms. Christensen did not, however, obtain Reverend Kim's written authority to make the offer.

Riihimaki v. Kim (In re Kim), 565 B.R. 169, 172 (Bankr. D. Haw. 2017).

> Ms. Christensen, Mr. and Mrs. Dunn, and Reverend Kim met several times to discuss the counteroffer. The circumstances of those meetings were far from ideal (most of the meetings were held in bars and restaurants over drinks). Further, the dispute with Mrs. Riihimaki made Reverend Kim very angry; she believed that Mrs. Riihimaki had defrauded her, rather than the other way around, and resented the fact that she might have to compromise with Mrs. Riihimaki. Nevertheless, by the last such meeting, Reverend Kim was fully informed of, understood, and agreed to the terms of the counteroffer. Reverend Kim orally authorized Ms. Christensen to accept the counteroffer, and Ms. Christensen did so. Because Reverend Kim understood the terms of the counteroffer, there was a meeting of the minds about the essential terms of the settlement. Ms. Christensen did not obtain Reverend Kim's written authorization, in any form, before sending the acceptance.

-6-

> Ms. Riihimaki's counsel prepared a draft settlement agreement. (Nothing in the counteroffer or the acceptance provides that the parties' agreement was contingent upon the execution of a formal settlement agreement.) The draft settlement agreement included provisions that were inconsistent with and materially different from the terms of the accepted counteroffer.
>
> . . . .
>
> Ms. Christensen presented Reverend Kim with the draft settlement agreement. Despite the numerous glaring inconsistencies between the accepted counteroffer and the draft settlement agreement, Ms. Christensen told Reverend Kim that it was a "take it or leave it" proposition. Upon reviewing the draft, Reverend Kim, for the first time, instructed Ms. Christensen to discontinue seeking a settlement. She said that she felt defrauded by Ms. Riihimaki, rather than vice versa, and she now wanted to prove it.
>
> Reverend Kim never agreed to the terms in the draft settlement agreement that varied from the July 31 counteroffer.

Id. at 174-75.

The terms of the Draft Settlement Agreement that differed from the Counteroffer included the following: (i) a requirement that Reverend Kim admit that the judgment was based on false pretenses, a false representation, or actual fraud; (ii) releases in favor of Ms. Riihimaki were to become effective long before the releases in favor of defendants; (iii) extra conditions were imposed before Ms. Riihimaki would be required to withdraw her HRICO complaint; (iv) Reverend Kim was required to provide extensive information to Ms. Riihimaki and limit her business activity to the Church and Realty until the entire judgment was satisfied; and (v) Reverend Kim would be required to obtain an order from the bankruptcy court that authorized her to act for and on behalf of the chapter 7 trustee to the extent necessary to dismiss the claims in the state court action and the

-7-

counterclaims in the adversary proceeding.  Id.

Based on these findings, the bankruptcy court concluded that although Reverend Kim had not agreed to the terms of the Draft Settlement Agreement, she had agreed to the terms of the Counteroffer; thus, the terms outlined in the Counteroffer were enforceable as a valid contract.  Applying Hawaii state law, the bankruptcy court concluded that although Reverend Kim did not provide written authorization for Ms. Christensen to settle the adversary proceeding, she had ratified the terms of the settlement as outlined in the Counteroffer:

> Given her knowledge of and acquiescence in the ongoing settlement discussions and of the efforts that the attorneys were expending to negotiate and document the settlement, she waited an unreasonably long time to raise her objections.  Therefore, she ratified her attorney's acceptance of the counteroffer and both she and Mrs. Riihimaki are bound by it.

Id. at 177.

The bankruptcy court thereafter entered a judgment declaring that the Counteroffer constituted a binding and enforceable contract between Appellee and Appellants.  Appellants timely appealed (BAP No. HI-17-1066).  A BAP motions panel granted leave to appeal on June 6, 2017, and the bankruptcy court granted a stay pending appeal.

After the first appeal was filed, Ms. Riihimaki filed a motion for attorneys' fees and costs based on the attorneys' fee provision in the Counteroffer and Haw. Rev. Stat. § 607-14. Ms. Riihimaki requested total fees and costs of $177,449.37. Appellants opposed the motion, arguing that (i) Ms. Riihimaki was not entitled to attorneys' fees because LBR 7054-2 permits a prevailing party to move for attorney's fees and costs only if

-8-

the judgment so provides; (ii) Ms. Riihimaki was not the prevailing party; and (iii) the time sheets did not contain sufficient descriptions, included billing for work that was excessive, redundant and unnecessary, and contained many "block-billed" entries. Appellants also disputed the cost request on similar grounds.

At a hearing in April 2017, the bankruptcy court granted Ms. Riihimaki's motion for fees and costs in part. The court found that LBR 7054-2 did not preclude the award. The bankruptcy court concluded that it could award fees under Haw. Rev. Stat. § 607-14, which authorizes attorneys' fees to a prevailing party in actions on a written contract that provides for such an award and limits the award to 25 percent of the judgment amount. The court concluded that Ms. Riihimaki was the prevailing party on the main disputed issue of whether there was a settlement. The court disallowed some of the fees and costs and entered an order granting fees of $161,212.43 and costs of $16,236.94. Appellants timely appealed that order (BAP No. HI-17-1137).

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

Whether the bankruptcy court erred in granting Ms. Riihimaki's motion to enforce.

Whether the bankruptcy court abused its discretion in awarding attorneys' fees to Ms. Riihimaki.

-9-

**STANDARDS OF REVIEW**

Whether a contract is enforceable is a question of law that is reviewed de novo. Local Motion, Inc. v. Niescher, 105 F.3d 1278, 1280 (9th Cir. 1997). Under de novo review, we look at the matter anew, as if it had not been heard before, and as if no decision had been rendered previously, giving no deference to the bankruptcy court's determinations. Freeman v. DirecTV, Inc., 457 F.3d 1001, 1004 (9th Cir. 2006).

Whether parties intended to create a contract is a factual question that we review for clear error, Bay Area Typographicsl Union, Union No. 21 v. Alameda Newspapers, Inc., 900 F.2d 197, 199 (9th Cir. 1990), as is whether a ratification occurred. See McDonnell v. Pennington, 40 Haw. 265, 268 (1953) (whether facts in evidence show ratification is a question of fact for the jury).

A court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record. United States v. Hinkson, 585 F.3d 1247, 1261–62 & n.21 (9th Cir. 2009) (en banc) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 577 (1985)). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. Anderson, 470 U.S. at 574; see also Hinkson, 585 F.3d at 1260 (recognizing the rule that a trial court's choice between two permissible views of the weight of evidence is not clearly erroneous where the evidence would support a conclusion either way, citing United States v. Yellow Cab Co., 338 U.S. 338, 342 (1949)). When factual findings are based on determinations regarding the credibility of witnesses, we give

-10-

great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting Anderson, 470 U.S. at 575).

We review a bankruptcy court's determination on attorney's fees for abuse of discretion or erroneous application of the law. Bertola v. N. Wisc. Produce Co. (In re Bertola), 317 B.R. 95, 99 (9th Cir. BAP 2004). A bankruptcy court abuses its discretion if it applies the wrong legal standard, misapplies the correct legal standard, or if its actual findings are clearly erroneous. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

## DISCUSSION

**A. The bankruptcy court did not err in granting Ms. Riihimaki's motion to enforce.**

**1. The bankruptcy court did not err in applying Hawaii state law to the question of enforceability.**

The bankruptcy court correctly applied Hawaii state law to the question of whether the settlement was enforceable. See O'Neil v. Bunge Corp., 365 F.3d 820, 822 (9th Cir. 2004) (in the absence of federal statute governing the matter, Oregon law would have applied to determine the enforceability of a settlement agreement); United Commercial Ins. Servs., Inc. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir. 1992) ("the construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally.").

-11-

Although Ms. Riihimaki did not cross-appeal, she argues that the bankruptcy court should have applied federal law to determine the question of Ms. Christensen's authority to settle the nondischargeability action because the underlying matter was a federal question (nondischargeability) being decided in a federal court. Under federal common law, once a settlement has been entered into, a presumption is created that the attorney who enters into the settlement agreement had the authority to do so, and the burden to show that there was no consent to the settlement is placed on the person challenging the validity of the agreement. Scott v. Burns Int'l Sec. Servs., Inc., 165 F. Supp. 2d 1133, 1139 n.5 (D. Haw. 2001), rev'd in part on other grounds, vacated in part sub nom. Scott v. Borg Warner Protective Servs., 55 F. App'x 414 (9th Cir. 2003).

Assuming without deciding that Ms. Riihimaki did not need to file a cross-appeal to raise this argument, we do not find it persuasive. The primary issue for the bankruptcy court was the enforceability of the settlement. Ms. Christensen's authority to settle was implicated in answering the question of whether there was a meeting of the minds and an acceptance under contract law, but that authority was not the primary issue to be determined. And the Ninth Circuit cases cited above make clear that the enforceability of a settlement is to be determined in accordance with state law, unless there is a controlling federal statute.[3]

---

[3]Additionally, even though federal law controls the issue of nondischargeability, a determination of the existence and amount of the underlying debt is controlled by state law. Grogan v. Garner, 498 U.S. 279, 283-284 (1991).

-12-

## 2.   Requirements for an enforceable contract under Hawaii law

Under Hawaii law, "[a] compromise agreement, like other contracts, requires an offer and acceptance, consideration, and parties who have the capacity and authority to agree as they do." Amantiad v. Odum, 977 P.2d 160, 170 (Haw. 1999) (citing 15A Am. Jur. 2d Compromise and Settlement § 7 (1976)). There must also be mutual assent or a meeting of the minds as to the essential elements of the contract. Siopes v. Kaiser Found. Health Plan, Inc., 312 P.3d 869, 879 (Haw. 2013).

The parties do not dispute that they had the capacity to enter into a contract, that Ms. Riihimaki, through counsel, made an offer (the Counteroffer) and that Ms. Christensen accepted the Counteroffer on Reverend Kim's behalf, and that the parties' mutual promises constituted consideration. The dispute in this appeal centers around (i) whether Reverend Kim understood the terms of the Counteroffer such that there was a meeting of the minds and (ii) whether Reverend Kim ratified the terms of the Counteroffer in the absence of express written consent to her attorney to settle. The bankruptcy court found that Reverend Kim understood the terms of the Counteroffer; thus there was a meeting of the minds as to those terms. The bankruptcy court further found that Reverend Kim ratified her attorney's acceptance of the Counteroffer by failing to timely object, resulting in an enforceable contract. For the reasons explained below, we find no error in these conclusions.

### 3. The bankruptcy court did not clearly err in finding that Reverend Kim understood the terms of the Counteroffer and ratified it.

Under Hawaii law, an attorney must have express written consent from a client to settle a lawsuit. Hawai'i Hous. Auth. v. Uyehara, 883 P.2d 65, 71 (Haw. 1994). Specifically, Haw. Rev. Stat. § 605-7 provides:

> The practitioners licensed by the supreme court shall have control to judgment and execution, of all suits and defenses confided to them; provided that no practitioner shall have power to compromise, arbitrate, or settle such matters confided to the practitioner, unless upon special authority in writing from the practitioner's client.

It is undisputed that Reverend Kim never gave written authority to Ms. Christensen to settle the adversary proceeding. Hawaii law, however, recognizes an exception to the written authority requirement if the client ratifies the settlement. Uyehara, 883 P.2d at 71. Whether the client has ratified the settlement depends on the facts and circumstances of the particular case. Scott v. Pilipo, 25 Haw. 386, 390 (1920). Ratification may be express or implied. Id. Ratification may be implied where the client acquiesces in the settlement by failing to object to the settlement within a reasonable time or by accepting the benefits of the settlement. Nelson v. Boone, 890 P.2d 313, 321 (Haw. 1995); Scott, 25 Haw. at 390; McKeague v. Freitas, 40 Haw. 108, 115 (1953); Cook v. Sur. Life Ins., Co., 903 P.2d 708, 716 (Haw. App. 1995), as amended (Aug. 30, 1995).

Appellants contend that these cases stand for the proposition that a significant time – years – must pass without objection before a failure to object can be deemed a ratification, or that the party opposing enforcement sought or

-14-

received benefits under the settlement agreement. No such requirements are contained in the cited cases, which make clear that whether ratification occurred is an intensely factual determination; as such, those cases do not establish any bright line rules regarding the requirements for ratification.

Despite conflicting testimony, there is evidence in the record to support the bankruptcy court's findings that Reverend Kim both understood and ratified the terms of the Counteroffer. Ms. Christensen testified that after she received the Counteroffer, she met with Reverend Kim three times to review it. At the third meeting on August 19, 2015, Ms. Christensen completed reviewing the Counteroffer with Reverend Kim and understood that Reverend Kim wanted her to accept the terms of the Counteroffer. It is undisputed that the next day, Ms. Christensen sent an email to Ms. Riihimaki's counsel stating that the terms of the Counteroffer were acceptable to her clients.

Ms. Christensen testified that Reverend Kim's acceptance was "not in so many words." But later, Ms. Christensen testified that she did not believe she had misunderstood Reverend Kim's instructions to accept. Moreover, she advised Reverend Kim that she had accepted the Counteroffer, and Reverend Kim did not object.

Ms. Christensen then testified that on August 26, 2015, at Reverend Kim's request, she emailed a copy of the July 17 settlement proposal and Counteroffer to Reverend Kim. Two days later, Ms. Christensen met with Reverend Kim and the Dunns. At that meeting, Reverend Kim indicated to Ms. Christensen that she

-15-

was still on board with the settlement; moreover, Reverend Kim told Ms. Christensen that she had shown the offer and Counteroffer to a friend, who had advised Reverend Kim to accept the Counteroffer. Over the next few weeks, Ms. Christensen communicated with Mr. Sakimura regarding the language of the settlement agreement; she also had several meetings with Reverend Kim. On September 11, 2015, she met with Reverend Kim and the Dunns to discuss the settlement agreement. On September 18, 2015, Ms. Christensen received the Draft Settlement Agreement by email from Mr. Sakimura. Later that day, she met with Reverend Kim at Mr. Dunn's office, but this meeting was primarily to discuss a proposed sale of certain property. It is not clear exactly when Reverend Kim was provided a copy of the Draft Settlement Agreement, but on September 22, 2015, Ms. Christensen again met with Reverend Kim and the Dunns. The ostensible purpose of the meeting was for Ms. Christensen to answer Reverend Kim's questions about the settlement agreement and possibly obtain Reverend Kim's signature. Ms. Dunn had been reviewing the settlement terms with Reverend Kim, and Reverend Kim had questions that Ms. Dunn could not answer. According to Ms. Christensen's testimony, the status of the settlement was discussed, but it was not clear that anything substantive was accomplished at this meeting ("there was a lot of social banter . . . so it was hard to get a lot of focus on [the settlement] at that meeting, but . . . we did discuss the status and . . . we had an agreement, but often with these restaurant meetings it was hard to really . . . focus."). In any event, Reverend Kim did

-16-

not raise any objection to the settlement at this meeting.[4]

Another meeting occurred on September 29, 2015. Ms. Christensen could not recall what was discussed at that meeting, but it was around this time that Reverend Kim refused to sign the Draft Settlement Agreement.[5] Shortly thereafter, Ms. Christensen withdrew from representing Reverend Kim.

The Dunns' testimony was not helpful in either corroborating or contradicting Ms. Christensen's version of events; neither of them seemed to remember any details of the various meetings they attended. Ms. Christensen's time sheets and the text messages exchanged between Ms. Christensen and the Dunns, however, were consistent with her version of events.

Reverend Kim contradicted much of Ms. Christensen's testimony. Reverend Kim testified that she had not authorized Ms. Christensen to accept the Counteroffer, had never seen the offer or Counteroffer, and did not tell Ms. Christensen that her friend had advised her to accept the settlement.

The bankruptcy court did not explicitly find that Reverend Kim's testimony was not credible. Such a finding was implicit, however, in the court's statement that "I have considered all of the testimony and other materials that were

---

[4]Ms. Christensen also testified that Reverend Kim never asked for an interpreter or asked for a Korean translation of the settlement terms.

[5]There was some testimony at trial indicating that Reverend Kim expected to receive some insurance proceeds that she could use to fund further litigation, suggesting that this gave her a motive to renege on the agreement. The bankruptcy court made no such finding, however.

received in evidence, much of which is in sharp conflict, and have evaluated the credibility and weight of each piece of evidence[,]" In re Kim, 565 B.R. at 171, and in its factual findings, which were consistent with Ms. Christensen's testimony rather than Reverend Kim's. As such, we must defer to the bankruptcy court's finding that Reverend Kim was aware of and authorized Ms. Christensen to accept the terms of the Counteroffer. The bankruptcy court found that Reverend Kim raised no objections "until the settlement negotiations were complete and a draft of a formal settlement agreement (which was not necessary to the effectiveness of the agreement) was presented to her." From this, and from the fact that Reverend Kim knew about and acquiesced in the ongoing settlement discussions and the efforts that the attorneys were expending to negotiate and document the settlement, the bankruptcy court concluded that "she waited an unreasonably long time to raise her objections."

Appellants argue that the record does not support these findings. Appellants' argument, however, is dependent upon accepting Reverend Kim's version of events, i.e., that she did not see the offer or Counteroffer and did not understand the terms and conditions of the Counteroffer. Appellants also attempt to cast doubt on whether Ms. Kim understood the terms of the Counteroffer by pointing out that English is Ms. Kim's second language but that no interpreter was present during any of her meetings with Ms. Christensen. Appellants note further that most of the meetings were held in noisy, dimly lit restaurants where alcohol was being consumed. It was undisputed, however, that

-18-

Reverend Kim specifically declined having an interpreter present. And the bankruptcy court, having heard testimony from all parties present at those meetings, implicitly concluded that the circumstances of the meetings, while not ideal, had not hindered Reverend Kim's understanding of the settlement terms. As noted, the bankruptcy court implicitly rejected Reverend Kim's testimony as not credible, and the other evidence in the record supports the bankruptcy court's findings. Accordingly, we find no clear error in the bankruptcy court's factual finding that Reverend Kim ratified the Counteroffer.[6]

---

[6]Although the Draft Settlement Agreement contained terms that were materially different from the Counteroffer, this did not negate the enforceability of the Counteroffer. As the bankruptcy court found, the Counteroffer did not require a written agreement; thus a binding contract was created when Reverend Kim accepted the Counteroffer. Accordingly, the varying material terms in the Draft Settlement are more appropriately viewed as a proposed modification to the contract. See Shanghai Inv. Co., Inc. v. Alteka Co., 993 P.2d 516, 531 (Haw. 2000), overruled in part on other grounds by Blair v. Ing, 31 P.3d 184, 188 (Haw. 2001) ("[a] modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed.") (quoting Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co., 147 F.3d 636, 641 (7th Cir. 1998)). "The original contract generally remains in force except as modified or superseded by the new agreement." Id. But because Reverend Kim did not accept that modification, it is not binding on the parties.

Importantly, Ms. Riihimaki asks this Panel to affirm the bankruptcy court's ruling, thus implicitly abandoning the terms of the Draft Settlement Agreement and accepting the terms of the Counteroffer.

-19-

**B. The bankruptcy court did not abuse its discretion in awarding attorneys' fees and costs to Ms. Riihimaki.**

The bankruptcy court granted most of the fees and costs requested by Ms. Riihimaki, finding that Ms. Riihimaki was the prevailing party. The attorneys' fee award was authorized under Paragraph 16.d. of the Counteroffer: "If any action or proceeding is commenced to enforce the terms of the settlement agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs incurred therein, in an amount to be determined by the court." The fee award was subject to Haw. Rev. Stat. § 607-14, which provides, in relevant part:

> In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

In determining who is the prevailing party under this statute, Hawaii courts focus on which party prevailed on the disputed main issue. Countrywide Home Loans, Inc. v. Hoopai (In re Hoopai), 581 F.3d 1090, 1101-02 (9th Cir. 2009) (citing Food Pantry, Ltd. v. Waikiki Bus. Plaza, Inc., 575 P.2d 869, 879 (Haw. 1978)). The disputed main issue is determined by "looking to the pleadings and proof in a particular case[.]" Id. at 1102 (citing Fought & Co., Inc. v. Steel Eng'g & Erection, Inc.,

-20-

951 P.2d 487, 503 (Haw. 1998); additional citation omitted). "[T]he 'prevailing party' is the party that succeeds on the issue or issues that are (1) the 'principal' issues raised in the litigation and (2) disputed by the parties." Id.

The bankruptcy court concluded that the disputed main issue was whether there was a settlement and that Ms. Riihimaki had prevailed on that issue. The court noted that the terms of that settlement, while important, were not the main issue.

Appellants do not dispute the amount of the attorneys' fees and costs awarded or the bankruptcy court's conclusion that LBR 7054-2 did not preclude the award. Appellants' sole argument is that Ms. Riihimaki was not the prevailing party on the main disputed issue of the motion to enforce. They reason that the motion sought enforcement of the Draft Settlement Agreement that Reverend Kim had objected to, but the bankruptcy court ruled that the Counteroffer, not the draft written agreement, should be enforced.

We agree with the bankruptcy court that the main disputed issue of the motion to enforce was whether a settlement had been reached; the exact terms of that settlement were secondary. In her motion, Ms. Riihimaki argued that Appellants had accepted the terms of the Counteroffer, resulting in a binding contract between the parties, and that Reverend Kim's refusal to sign the Draft Settlement Agreement was unjustified. In their opposition, Appellants argued that Reverend Kim had not authorized settlement in writing as required under Hawaii law and that Reverend Kim had not ratified the settlement; thus the settlement was not enforceable. In short, the parties focused virtually all of

-21-

their arguments on the issue of whether an enforceable agreement existed. The bankruptcy court ruled that it did; thus Ms. Riihimaki was the prevailing party. The fact that the bankruptcy court ruled that the terms agreed to were those contained in the Counteroffer rather than the Draft Settlement Agreement does not change that conclusion. Accordingly, the bankruptcy court did not abuse its discretion in awarding attorneys' fees and costs.

**CONCLUSION**

For the reasons explained above, we AFFIRM both the bankruptcy court's order granting the motion to enforce and its order granting attorneys' fees to Ms. Riihimaki.