2025 IL App (1st) 231917
No. 1-23-1917

FIRST DIVISION
June 9, 2025

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PALOS COMMUNITY HOSPITAL, a Not-for-Profit Community Hospital, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 2022 L 2971 (renumbered from 2013 L 7185) |
| HUMANA INSURANCE COMPANY, | ) ) | |
| Defendant-Appellee. | ) ) ) ) ) | The Honorable Jerry A. Esrig, Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.


**OPINION**

¶ 1    In this breach of contract action, plaintiff-appellant Palos Community Hospital (Palos) appeals from the circuit court orders that (1) entered summary judgment in favor of defendant-appellee Humana Insurance Company (HIC) upon the parties' cross-motions for summary judgment and (2) denied Palos's motion to reconsider. We reverse the grant of summary judgment and remand for further proceedings, as the record presented genuine issues of material fact.

¶ 2                                    BACKGROUND

¶ 3    This action arises from Palos's claim that it was underpaid for several years by HIC, an affiliate of Humana, Inc. (Humana), when HIC reimbursed the hospital for medical services provided to patients insured by HIC. Specifically, Palos alleges that HIC underpaid it from 2004 through 2010, by applying lower reimbursement rates under the wrong governing contract. Palos claims that it was entitled to higher rates of reimbursement under an agreement entered in 2002 between Palos and the ChoiceCare network, a separate entity that is also affiliated with Humana.[1] Palos alleges that HIC's underpayment violated the terms of a third agreement between ChoiceCare and HIC, to which Palos was a third-party beneficiary. HIC maintains (and the trial court agreed) that there was no breach because HIC properly reimbursed Palos at the lower rates called for by a separate, preexisting direct contract with Palos (the Michael Reese contract) that HIC became a party to in the 1990s. The heart of the dispute is whether (and if so, when) HIC became party to the Michael Reese contract.

¶ 4    Notably, this is the second time this matter has been before this court. After a 2018 jury trial led to a verdict in favor of HIC, this court affirmed (*Palos Community Hospital v. Humana, Inc.*, 2020 IL App (1st) 190633), but our supreme court reversed and remanded to the trial court. *Palos Community Hospital v. Humana Insurance Co.*, 2021 IL 126008 (concluding that the trial court erred in denying Palos's motion for substitution of judge). On remand, the parties filed the cross-motions for summary judgment that are at issue in the instant appeal.

¶ 5    Palos has been a health care provider since 1973. As such, it contracts with numerous insurers, such as health maintenance organizations (HMOs) and preferred provider organizations

---

[1]This case requires reference to a number of distinct corporate entities that are all affiliated with the same holding company, Humana. For clarity, this decision will use "Humana" to refer only to the holding company; we will use other terms to refer to the separate affiliated entities.

(PPOs).[2] Through HMOs and PPOs, insurers offer healthcare providers more patient volume; in exchange, the providers agree to discounted medical fees.

¶ 6                                  The 1990 Michael Reese Contract

¶ 7         In June 1990, Palos entered into a contract with an HMO then known as Michael Reese Health Plan, Inc. (Michael Reese). Under that contract (the Michael Reese contract), Michael Reese agreed to refer certain of its enrollees to Palos and agreed to pay Palos according to a fee schedule appended to the contract.[3] It is undisputed that, during the 2004 to 2010 period at issue, Palos's reimbursement rates under the Michael Reese contract were lower than the reimbursement rates under the 2002 ChoiceCare agreement.

¶ 8         Acquisition of Michael Reese and Assignment of the Michael Reese Contract

¶ 9         In February 1991, Michael Reese was acquired by Humana Health Plan, Inc. (HHP). HHP is an HMO. HHP is a separate corporate entity from HIC, the defendant-appellant herein.

¶ 10        On February 15, 1991, Palos executed a "Consent to Assignment" of "all of the current duties, rights and interests of Michael Reese Health Plan, Inc." under the Michael Reese contract to HHP.

¶ 11                          The 1991 Amendment to the Michael Reese Contract

---

[2]HMOs "have their own network of doctors, hospitals and other healthcare providers who have agreed to accept payment at a certain level for any services they provide. This allows the HMO to keep costs in check for its members." *What is an HMO*?, Humana (Apr. 29, 2025, 1:30 PM), https://www.humana.com/medicare/medicare-resources/what-is-hmo [https://perma.cc/L9AU-WZHM]. A PPO, as stated in the affidavit of HIC witness John Maxwell, "is an arrangement whereby a healthcare provider *** contracts with third-party payors *** under which the provider discounts its fees in exchange for being part of a network and receiving 'steerage' of patients by the payor, usually via financial incentives in the patients' benefits plans insured or administered by the payor."

[3]The same underlying contract is referred to by various names in the record and the parties' briefing, including the "1990 Contract", the "MRHP Contract," or the "Direct Contract." For clarity, we refer to it consistently as the Michael Reese contract.

¶ 12    In July 1991, Palos and HHP executed an amendment to the Michael Reese agreement. The interpretation of the 1991 amendment is key to this appeal. The amendment stated:

> "Palos Community Hospital hereby agrees to provide medical services as defined in the aforementioned agreement *** to members enrolled in Humana Health Care Plans Preferred Provider Organization ('PPO'). Such medical services will be provided under the same terms and conditions specified in the hospital agreement for members of Humana-Michael Reese Health Maintenance Organization."

The signature lines to the 1991 amendment indicate it was signed by Sister Margaret Wright on behalf of Palos, and by Barry Averill on behalf of "Humana Health Plans, Inc."

¶ 13    There is no dispute that the 1991 amendment did not explicitly name HIC. It is also undisputed that there was no entity with the name "Humana Health Care Plans Preferred Provider Organization." However, HIC maintained that the phrase "Humana Health Care Plans Preferred Provider Organization" referred to HIC, such that HIC was thereafter entitled to the reimbursement rates under the Michael Reese contract.

¶ 14    Subsequent Amendments to the Michael Reese Contract Reference HIC

¶ 15    The Michael Reese contract was amended again in amendments that became effective in January 1996, May 2004, October 2004, May 2005, and October 2008. Each of those amendments was signed by Palos and by "HUMANA", which was defined to include several entities.

¶ 16    Notably, the 2005 and 2008 amendments to the Michael Reese contract—executed during the period in which Palos claims it was underpaid by HIC—specifically referenced HIC as one of

the bound "HUMANA" entities. That is, the 2005 amendment to the Michael Reese contract recited:

> "The agreement by and between HUMANA Health Plan, INC., HUMANA Health Chicago, INC., *HUMANA Insurance Company* and HUMANA HealthChicago Insurance Company and their affiliates, (collectively referred to herein as 'HUMANA'), and Palos Community Hospital *** entered into on February 15, 1991 *** is hereby amended as follows:" (Emphasis added).

The 2005 amendment was signed by Paul Maxwell on behalf of Humana and by Sister Margaret Wright, Palos's president.

¶ 17 Similarly, the 2008 amendment to the Michael Reese contract began with the recital that:

> "The agreement by and between HUMANA Health Plan, Inc., HUMANA Health Chicago, INC., *HUMANA Insurance Company* and Humana HealthChicago [I]nsurance Company and their affiliates (collectively referred to herein as 'HUMANA'), and Palos Community Hospital *** entered into on February 1, 1991 *** is hereby amended as follows:" (Emphasis added.)

The 2008 amendment set forth new reimbursement rates for certain hospital services.

¶ 18 The ChoiceCare Network and the HIC-ChoiceCare "Payor Agreement"

¶ 19 A separate Humana entity is Health Value Management, Inc., d/b/a ChoiceCare Network ("ChoiceCare"). ChoiceCare is not an insurance plan such as an HMO or a PPO; that is, ChoiceCare does not independently insure anyone. Rather, ChoiceCare administers a network of providers and negotiates reimbursement on behalf of insurers.

¶ 20     In June 1999, Humana sent a letter to Palos informing it that as of August 1999, Humana "will assume the management and operation of its provider network and rename it ChoiceCare."

¶ 21     In November 2000, ChoiceCare and HIC entered into a "Payor Agreement," with HIC as "Payor." The Payor Agreement recited that ChoiceCare had developed healthcare provider networks and that HIC desired to contract with ChoiceCare "in order to provide access to health care services available for [HIC's] Covered Persons." The Payor Agreement also recited that ChoiceCare "has contracted *** with Preferred Providers to provide Covered Services" and "will enter into Provider Agreements with Preferred Providers."[4]

¶ 22     In paragraph IV.A(1) of the Payor Agreement, HIC agreed to "reimburse Preferred Providers according to the reimbursement amounts specified in ChoiceCare's agreements with Preferred Providers." However, paragraph IV.E provided that: "Nothing in this paragraph is intended to supersede Payors' right to reimburse Preferred Providers in accordance with terms included in provider agreements directly between Payor and Preferred Providers (if any)."

¶ 23     The HIC-ChoiceCare Payor Agreement stated that "No person or entity other than a Preferred Provider shall be a third-party beneficiary of this Agreement." Palos asserts it was a third-party beneficiary of the Payor Agreement.

¶ 24          Palos Joins the ChoiceCare Network (ChoiceCare Contract)

¶ 25     In April 2002, ChoiceCare sent Palos a letter inviting Palos to become part of the "ChoiceCare provider network," stating it was one of the nation's largest health care networks. The letter stated "ChoiceCare Network is a part of *** a wholly owned subsidiary of Humana, Inc.; therefore, the proposed rate structure would be at parity with the rate structure currently in

---

[4]"Preferred Providers" was defined to mean "[t]he hospitals *** and other health care providers with which CHOICECARE has entered into Provider Agreements for the Provision of Covered Services." There is no dispute that Palos was a "Preferred Provider" within the meaning of the Payor Agreement.

place for the Humana PPO Product lines." The letter stated that the ChoiceCare network "gives Humana true national presence, and in the short time that ChoiceCare has been in existence the PPO membership has grown to over one million members" in the United States.

¶ 26 In June 2002, Palos and ChoiceCare entered into a "Hospital Participation Agreement" (hereinafter the ChoiceCare contract) by which Palos joined the ChoiceCare network. The agreement recited that "ChoiceCare administers the provider network for such other third party payor(s) (hereinafter referred to as 'Payor' or 'Payors') issuing and/or administering the Plans."

¶ 27 In the ChoiceCare contract, Palos agreed to provide services to "Members," *i.e.*, persons "covered under designated *** insurance policies, or other third party payors' health benefits contracts." For providing medical services to members, Palos "agree[d] to accept a thirty-five percent (35%) discount from standard billed charges for inpatient services and a twelve percent (12%) discount from standard billed charges for outpatient services," less applicable copays. The reimbursement rates in the ChoiceCare contract were higher than the rates applicable pursuant to the Michael Reese contract during the relevant time period.

¶ 28 However, in a provision analogous to paragraph IV.E of the Payor Agreement, section 13.6 of the ChoiceCare contract indicated that it did not supersede any preexisting direct contract between a payor and Palos:

> "Nothing in this Agreement shall limit or prohibit a Payor from contracting directly with or maintaining a direct agreement with Hospital and utilizing such direct agreements for payment for Covered Services to Members. In the event that Payor elects to apply discounts from their direct agreement with Hospital, the Payor shall

not apply the discount from this Agreement so long as its direct agreement with Hospital remains in effect."

¶ 29    The parties dispute whether HIC, as a payor, had a "direct agreement" with Palos within the meaning of section 13.6 of the ChoiceCare contract. HIC maintains that the Michael Reese contract (as amended in 1991 and subsequently) was such a direct contract between HIC and Palos. Palos maintains that HIC was never a party to the Michael Reese contract, such that Palos was entitled to the reimbursement rates in the ChoiceCare contract.

¶ 30    Dispute Arises as to Which Contract Governs Palos's Reimbursement Rates

¶ 31    The record reflects that the reimbursement rates under the Michael Reese contract and the 2002 ChoiceCare contract were identical until 2004, when an amendment to the Michael Reese contract lowered the reimbursement rates under that contract.

¶ 32    On July 1, 2004, Palos's chief financial officer, Andrew Stefo, sent a letter to Humana Vice President Paul Maxwell regarding a "troubling" issue. Stefo stated: "It has come to [Palos's] attention that Choice Care is accessing Humana's PPO discounts." Stefo asserted that Palos "operates under a separate agreement with Choice Care (June 25, 2002) which should govern the payments received for services rendered to its members." Stefo asked that Humana "ensure that the Humana and Choice Care contracts are adjudicated according to the terms of these respective agreements" and to "[c]oordinate the proper, additional reimbursement due to Palos."

¶ 33    Palos subsequently hired a third party auditor. In 2010, Palos made a formal demand against HIC seeking payment of $21,964,243. In a March 2010 response, HIC asserted that Palos was "mistaken" in its belief that it had been underpaid. HIC maintained that the governing contract was not the ChoiceCare agreement, but rather the Michael Reese contract, "the same contract that both parties have been operating under since its original effective date of July 1, 1990," as

"amended over the years." Insofar as Palos relied on the ChoiceCare contract, HIC noted that it "contains a provision [paragraph 13.6] which allows [HIC] to elect to continue under a prior direct contract." HIC indicated its position that the governing agreement was the Michael Reese contract, as amended in 1991 "to include all PPO Members."

¶ 34 HIC further stated that "by continuing a course of conduct and course of performance of repeatedly accepting the benefits of steerage *** and payment for claims for services rendered to Humana Members without dispute, [Palos] has ratified the terms and conditions of the [Michael Reese] agreement."

¶ 35 Palos Commences the Lawsuit

¶ 36 In June 2013, Palos filed its original complaint for fraud and breach of contract against Humana, HIC, and other defendants. Palos filed an amended complaint in December 2014.

¶ 37 In the amended complaint, Palos alleged that Humana (as well as HIC and other Humana affiliates) failed to honor the ChoiceCare contract by causing Palos to be reimbursed "at rates materially lower than the agreed-upon 2002 ChoiceCare PPO Rates." Palos alleged that, for a number of years, Humana "concealed the reimbursement of health care services at less than the 2002 ChoiceCare PPO Rates *** for thousands of patients who presented health insurance cards with the ChoiceCare logo" to Palos.

¶ 38 Count IV of the amended complaint is the only surviving count at issue. In that count, Palos alleged that HIC breached the ChoiceCare-HIC Payor Agreement, to which Palos was a third-party beneficiary, by failing to properly reimburse Palos. Palos alleged that HIC breached by "paying a lesser amount during the Relevant Period to Palos Community Hospital as a Preferred Provider under the Payor Agreement than the 2002 ChoiceCare PPO Rates for services rendered" by Palos.

Palos alleged that it was damaged because it was "not reimbursed at the 2002 ChoiceCare PPO Rates."

¶ 39                    Trial, Prior Appeal, and Remand

¶ 40        Lengthy discovery disputes led the original trial judge (Honorable Sanjay Tailor) to appoint a retired judge as a "discovery master." In March 2017, the discovery master drafted a recommendation to the trial court to require Palos to respond to certain discovery requests. Palos filed a motion to strike in which it disputed the trial court's authority to appoint a discovery master; Palos also filed an objection to the discovery master's recommendation.

¶ 41        Before any ruling on those matters, the case was reassigned to Honorable Diane Shelley because Judge Tailor moved to the chancery division. After two hearings before Judge Shelley, in April 2017, Palos moved for substitution of judge as a matter of right, pursuant to section 2-1001(a)(2) of the Code of Civil Procedure. 735 ILCS 5/2-1001(a)(2) (West 2016). The trial court denied that motion as untimely, reasoning that Palos had "tested the waters" and formed an opinion on how the court might rule on discovery matters. See *Palos Community Hospital*, 2021 IL 126008, ¶ 13.

¶ 42        The parties proceeded with a number of depositions. Paul Maxwell testified as the corporate representative for the Humana defendants. In his January 2018 deposition, Maxwell testified that he had worked for Humana from 1991 (the year that it purchased the Michael Reese Health Plan) until 2006.

¶ 43        Maxwell explained that HIC is an insurance company licensed as a PPO, whereas "Humana Health Plan, Inc." is an HMO. Maxwell testified that the Michael Reese contract, as amended in 1991 and subsequently, was a direct contract between HIC and Palos.

¶ 44　　Maxwell did not state that he was personally involved in the negotiation of the 1991 amendment. Nevertheless, he testified to his belief that its phrase "Humana Health Care Plan Preferred Provider Organization" referred to HIC and that HIC was "the only PPO that [Humana] had at the time." He acknowledged the 1991 amendment was signed by Barry Averill on behalf of "Humana Health Plan, Inc." However, he believed that Averill had "signature authority" for HIC.

¶ 45　　In June 2018, the matter proceeded to a 10-day jury trial, during which numerous witnesses testified. Palos's primary witness was David Manchester, who served as Palos's vice president for professional services. Manchester joined Palos in 1979 and was involved in the negotiation of managed care contracts.

¶ 46　　Manchester testified he had personal knowledge regarding the circumstances surrounding the 1990 Michael Reese contract and the 1991 amendment. He explained that the original 1990 Michael Reese contract was an agreement with an HMO and that the Michael Reese HMO was subsequently acquired by HHP.

¶ 47　　As to the origin of 1991 amendment, Manchester testified that it had a relatively limited purpose:

> "Q. Now, going back to the Michael Reese HMO agreement, did there come a point in time when the hospital was approached to allow some PPO business into that agreement?
>
> A. Yes. That was, I believe, in 1991, not terribly long after that. As the Michael Reese Health Plan was continuing to try to grow its business in the Chicago metropolitan areas, it was our understanding they had approached the City of Chicago about enrolling a number of their employees.

As described to us by the representatives of the Michael Reese Health Plan, the City of Chicago was very reluctant because they didn't think their employees would go for an HMO contract at that time. \*\*\* They didn't feel that an HMO would have great marketability among their members, so they asked if they could qualify this as a \*\*\* Preferred Provider Organization or a PPO product.

So the representatives of Michael Reese came to us and said, could we piggy back this very specific group into the contract.

Q. And did the hospital ultimately agree?

A. Ultimately we did. It was a little unusual, but we agreed that it made sense. \*\*\*

Q. And did you believe that by consenting to allowing this particular PPO in, that the hospital was consenting to allowing any PPO in that Humana may have had?

A. No. They were very specific as to what the—you know, the brackets were around this group. We were very specific, and, you know, there was mutual understanding in that regard as to what it was."

¶ 48    Thus, Manchester testified to his understanding that the phrase "Humana Health Care Plans PPO" in the 1991 amendment had a limited meaning:

"Q. Now \*\*\* it references the PPO that we've been talking about.

A. Right. The Humana Health Care Plans PPO.

Q. And is that the specific PPO that the hospital agreed to allow access to this contract?

A. That's our understanding. This is the City of Chicago employees' group, yes."

He described the 1991 amendment as "an HMO agreement with sort of an asterisk next to it in regard for this group."

¶ 49      Manchester denied any there was any discussion in 1991 that the phrase "Humana Health Care Plans Preferred Provider Organization" was a trade name used to refer to HIC. He agreed that there was no mention of HIC in the 1991 amendment to the Michael Reese contract. Manchester acknowledged there were subsequent amendments to the Michael Reese contract, but he denied that those amendments added additional parties.

¶ 50      Palos also elicited trial testimony from Stefo. Similar to Manchester's testimony, Stefo indicated his belief that the 1991 amendment had a limited purpose to accommodate certain government employees. He understood that the amendment "allowed a very narrow county and city employee group to access *** the Michael Reese Health Plan HMO rates under their PPO."

¶ 51      Maxwell, Humana's director of provider contracting, also testified at trial. Maxwell acknowledged he was not involved in the discussions leading to the 1991 amendment. However, Maxwell testified to his understanding that the 1991 amendment added HIC as a party because "it added the term 'PPO,' which is an insurance company." He acknowledged the amendment was signed by "Humana Health Plans," not HIC. He also agreed there is not an entity named "Humana Health Care Plans Preferred Provider Organization."

¶ 52       Nonetheless, Maxwell maintained that the "PPO" referenced in the 1991 amendment could only have meant HIC, as HIC "was the only company Humana owned in Illinois at the time that could have offered a PPO." Thus, he believed that the amendment made HIC a party to the Michael Reese contract.

¶ 53       Elsewhere during the trial, HIC elicited testimony about its payment history through Laurie Poynter, who is HIC's director of Integrated Network Payment Solutions Team. In that role, she is responsible for the computer systems that maintain contract pricing and claim reimbursement data. Referring to an Excel spreadsheet, Poynter testified that from 2000 to 2002, HIC paid over 3000 PPO claims from Palos and that the total amount billed was between $4 million and $5 million.

¶ 54       The jury found HIC not liable on Palos' breach of contract claim, and the trial court entered judgment on that verdict.

¶ 55       Palos appealed the judgment, arguing, *inter alia*, that the trial court erred in denying its motion for substitution of judge as a matter of right. This court affirmed the judgment of the trial court. *Humana*, 2020 IL App (1st) 190633. However, our supreme court reversed, holding that the trial court erred in denying Palos's motion to substitute judge. *Palos Community Hospital*, 2021 IL 126008, ¶¶ 28-29. Our supreme court explained that the substitution motion was timely because Judge Shelly had not yet ruled on any substantial issue in the case. *Id.* (holding the "test the waters doctrine is incompatible with the plain language of section 2-1001(a)(2)"). Our supreme court remanded the matter to the trial court with directions to vacate all orders entered after the denial of the substitution motion and to conduct further proceedings. *Id.* ¶ 37.

¶ 56       Cross-Motions for Summary Judgment on Remand

¶ 57    On remand, the matter proceeded before Judge Jerry Esrig. In January 2023, HIC and Palos filed cross-motions for summary judgment, in which they referred to pretrial discovery as well as evidence from the 2018 jury trial.

¶ 58    In Palos's motion, it asserted the undisputed facts established that, between 2004 and 2010, HIC breached the Payor Agreement—to which Palos was a third-party beneficiary—by failing to reimburse Palos at the rates specified in the 2002 ChoiceCare contract.

¶ 59    Palos acknowledged that the ChoiceCare contract contained a "clause providing that, if HIC has a direct contract with Palos, it may pay the direct-contract rate instead of the ChoiceCare rate." However, Palos asserted that "no such direct contract exists." Palos acknowledged that HIC claimed the Michael Reese contract was a direct contract that governed the applicable reimbursement rates, but Palos argued that HIC never became a party to the Michael Reese contract. Insofar as HIC relied on the 1991 amendment referring to "Humana Health Care Plans Preferred Provider Organization," Palos emphasized that the 1991 amendment never mentioned HIC and was not signed by HIC. Rather, it "was signed only by Humana Health Plans and Palos." Thus, Palos asserted there was no "direct" contract whose rates could govern HIC's reimbursements to Palos, other than the ChoiceCare agreement.

¶ 60    Palos further argued that the subsequent amendments to the Michael Reese contract did not add HIC as a party, notwithstanding that their "prefatory clauses" listed HIC, among other Humana entities.

¶ 61    Palos additionally argued that because the ChoiceCare contract was an integrated contract, the "four corners" rule barred HIC from relying on extrinsic evidence to argue that Palos had accepted "underpayments [from HIC] without complaint." In any event, Palos cited testimony

from the 2018 trial that HIC's "underpayments were not obvious to Palos" and that it was only in 2009 that an audit "discovered the systematic underpayments."

¶ 62    In HIC's cross-motion for summary judgment, it contended there was no genuine issue of fact that HIC was made a party to the Michael Reese contract, which governed the applicable reimbursement rates it owed to Palos. HIC argued that the Michael Reese contract was a "direct agreement" of the sort contemplated by section 13.6 of the ChoiceCare contract and paragraph IV.E. of the Payor Agreement, such that HIC was entitled to pay the lower rates under the Michael Reese contract.

¶ 63    HIC relied on the 1991 amendment referring to "Humana Health Care Plans Preferred Provider Organization." HIC urged that although this amendment used a "brand name rather than its legal name," the evidence established that HIC was the only entity the 1991 amendment could possibly have referred to. HIC referred to deposition and trial testimony for the proposition that the term "Humana Health Care Plans PPO" meant HIC, as HIC was "the one and only Humana entity that offered a PPO to providers in the Chicago area."

¶ 64    HIC also claimed that because the 2005 and 2008 amendments did identify HIC, there was no doubt that HIC was a party to the Michael Reese contract. HIC urged that it was entitled to judgment because there was "no dispute that Palos was paid in accordance with" the Michael Reese contract. In support of its motion, HIC offered affidavits from Maxwell and Poynter.

¶ 65    The court heard argument on the cross-motions on April 7, 2023. Palos's counsel argued that the motions came down to whether HIC became a party to the Michael Reese contract. Palos acknowledged that paragraph 13.6 of the ChoiceCare contract would apply if HIC had a "direct contract with Palos," but argued that there was no such direct contract. Palos urged that the 1991 amendment did *not* make HIC party to the Michael Reese contract, emphasizing that it did not

contain the words "Humana Insurance Company" but referred to "members enrolled in Humana Health Care Plans Preferred Provider Organization."

¶ 66    HIC counsel argued that, since 1991, Palos has been an in-network provider "for the Humana PPO which for the entire time has been offered exclusively in Illinois by Humana Insurance Company, or HIC." HIC noted that both the Payor Agreement and ChoiceCare agreement provide that "if there's a direct agreement, that HIC is entitled to pay the rate in that direct agreement." HIC argued that the Michael Reese contract was a direct agreement and that HIC was entitled to pay the rates under that contract.

¶ 67    HIC's counsel acknowledged that the 1991 amendment "does not expressly refer to" HIC but urged there was no doubt that "the offeror of the PPO in question" was, in fact, HIC. HIC urged there was no dispute that HIC was the only Humana entity that offered a PPO in Illinois in the relevant time period. HIC's counsel also pointed out that the 2005 and 2008 amendments to the Michael Reese contract explicitly referred to HIC.

¶ 68    After hearing argument, the court ruled in favor of HIC and against Palos. In doing so, it agreed that the "central issue is whether HIC was added to the original 1990 [Michael Reese] contract such as to satisfy the direct contract provision in paragraph 13.6 of the payor agreement." The court found that HIC "is a party to the original 1990 contact by virtue of the 1991 amendment."

¶ 69    The court recognized that the parties disputed the meaning of the term "Humana Health Care Plans Preferred Provider Organization" within the 1991 amendment. Thus, the court stated that it "look[ed] to extrinsic evidence" on that issue. The court found that "all" of the extrinsic evidence "supports HIC's position that HIC is that entity, including the contemporaneous evidence that the one and only Humana PPO, the parties' course of dealings and subsequent amendments which specifically describe HIC."

¶ 70    The court explained its conclusion that the 1991 amendment referred to HIC:

> "Neither party claims or *** submits any evidence that Humana Health Care Plans Preferred Provider Organization was or is a freestanding entity. In fact, the very words, especially absent a corporate designation, suggests that it is a trade name. Moreover, the phrase correctly describes HIC and no other entity. The evidence is that at the time of the signing of the [1991] amendment, HIC was the only Humana Health Care Plans Preferred Provider Organization in Illinois."

¶ 71    The court also relied on the parties' "course of conduct" for its conclusion. It remarked that Palos "offers no evidence to dispute that HIC was, in fact, the only party who paid claims for Humana PPO patients since 1991 or that Palos accepted HIC's payments without objection." It noted that whether Palos knew the "formal name of the PPO organization at the time of the amendment is of no legal significance," as "[t]here was only one entity it could have been." The court also noted that HIC was "expressly named in subsequent amendments" to the Michael Reese contract that Palos signed.

¶ 72    On April 12, 2023, the court entered a corresponding written order denying Palos's motion for summary judgment and granting HIC's motion for summary judgment.

¶ 73    Palos filed a motion for reconsideration. In it, Palos asserted that once the court determined that there was an ambiguity in the 1991 amendment, it could not grant summary judgment because the ambiguity presented a question of fact for a jury. It urged that the court had "improperly decided a disputed fact issue" by evaluating extrinsic evidence after finding an ambiguity.

¶ 74     Palos otherwise asserted that the extrinsic evidence was not "one-sided," and that certain extrinsic evidence—some of which had not relied on in its motion—called into doubt whether HIC was the party referenced in the 1991 amendment. Among other evidence, Palos cited Manchester's 2018 trial testimony that the 1991 amendment was precipitated by Michael Reese's desire to extend the contract to a relatively limited group of government employees and that there was no discussion that "Humana Health Care Plans Preferred Provider Organization" was a trade name for HIC.

¶ 75     Palos separately argued that the 1991 amendment "included no contract-formation terms providing that a new party [HIC]was being added to the contract." Palos pointed out that the 1991 amendment was executed by only two entities: Palos and Humana Health Plans (HHP). HIC was not named in or a party to the amendment. Palos argued that without an expression of the parties' intent to add a new contracting party, no contract formation could occur.

¶ 76     The motion to reconsider was argued on July 14, 2023. In arguing that the 1991 amendment was not a "direct contract" between HIC and Palos, Palos argued that since HHP was a separate entity, it could not "contract for HIC." Palos argued that the 1991 amendment did not make HIC a party, because HIC did not sign it.

¶ 77     During the hearing on the motion to reconsider, the court asked HIC's counsel to address how HIC could be bound by the 1991 amendment when it was executed by a different entity, HHP. HIC counsel argued that, even if the 1991 amendment was signed by HHP, the parties' "subsequent course of conduct" showed an understanding that HIC was bound. HIC cited the 2005 and 2008 amendments, which explicitly named HIC.

¶ 78     This topic led to the following exchange:

"THE COURT: *** So we have an amendment that binds Palos at least to treat HIC patients in a certain way. That agreement is not signed by HIC, and you're not arguing to me that Humana Health Plans, Inc. signed on behalf of HIC.

[HIC COUNSEL]: Correct.

THE COURT: Okay. What you're telling me is that *** the court should view HIC's subsequent performance as indicating that it agreed to be bound.

[HIC COUNSEL]: Correct."

Subsequently, HIC reiterated its position that subsequent performance established that HIC was made a party to the Michael Reese contract:

"THE COURT: How could [HHP] bind HIC?

[COUNSEL]: Right, but *** it's undisputed that subsequent course of conduct shows that it did operate under that agreement. And again, the 2005 and 2008 amendments make this very clear, because they explicitly name HIC, and Palos obviously signed those, and that was the only time period in dispute here."

¶ 79         Palos's counsel responded by referring to extrinsic evidence from the time the 1991 amendment was negotiated, including Manchester's notes. The court expressed doubt that this contradicted its finding that "HIC is the entity referred to in the [1991] amendment" or evidence that "HIC acted as it if was bound by the amendment." The court indicated its view that the "subsequent amendments" that specifically mentioned HIC "ratified" the 1991 amendment.

¶ 80    The trial court then asked counsel whether there is evidence "that HIC was sending patients and receiving payments pursuant to the old Michael Reese agreement that was amended." HIC referred to Poynter's trial testimony that between 2000 and 2002, HIC paid over 3000 claims to Palos, totaling between $4 million and $5 million. In response, Palos counsel argued that Poynter's testimony did not establish that HIC's payments were made pursuant to the Michael Reese contract.

¶ 81    Palos further argued that there was no extrinsic evidence that "Humana Health Care Plans really meant HIC." Nonetheless, the court said it was "undisputed that HIC is a Humana Health Care Plans' preferred provider organization."

¶ 82    With respect to the 2005 and 2008 amendments, Palos's counsel argued extrinsic evidence showed that there was no "meeting of the minds" of an intent to bind HIC. Palos cited testimony from Demetrius Gordon, a Humana employee, that the preambles to the amendments that referenced HIC were drafted by Humana's corporate lawyers.

¶ 83    The court was unpersuaded, remarking that the evidence showed that "HIC was the only entity in Illinois that could have provided these services period." In concluding, the court said:

> "Look, as a matter of law, I may be wrong about [Palos's] argument
> that the amendments coupled with the subsequent conduct don't
> create a direct contract within the meaning of the ChoiceCare
> agreement. I don't think I'm wrong, but maybe I am. The appellate
> court will have to deal with that. I'm not going to change my ruling
> on that.
>
>     The evidence which I had at the time of the summary judgment
> ruling *** was that HIC *** was the only Humana Health Care

Plans preferred provider organization in Illinois to which this [1991]
amendment could have referred, that HIC performed and the
hospital accepted its performance during the relevant period of time
*** and that subsequent amendments executed by the parties
referred specifically to HIC. That evidence, which is uncontradicted,
in my mind establishes that HIC was the entity referred to in this
amendment and that as a matter of law that relationship was a direct
contract within the meaning of the ChoiceCare agreement."

¶ 84    In denying the motion to reconsider, the trial court noted that it was not considering evidence or arguments that had not been presented prior to its original ruling on the cross-motions for summary judgment. The court criticized Palos for citing extrinsic evidence in its motion to reconsider that was not referenced in its briefing on the cross-motions for summary judgment.

¶ 85                                              ANALYSIS

¶ 86    On appeal, Palos primarily contends that we should reverse and find that Palos, not HIC, was entitled to summary judgment. Palos avers that it established that HIC never became a party to the Michael Rese contract. Even if the 1991 amendment was referring to HIC, Palos maintains that amendment "unambiguously did not add HIC as a party" to the Michael Reese contract because (1) it was not executed by HIC and (2) it did not contain contract formation language. Palos asserts there was no other "direct contract" with HIC, so that Palos was entitled to the higher reimbursement rates under the ChoiceCare contract.

¶ 87    In the alternative to summary judgment in its favor, Palos argues we should reverse because the record at least presents genuine issues of fact that precluded granting HIC summary judgment, concerning (1) the identity of the entity referred to in the 1991 amendment as "Humana Health

Care Plans Preferred Provider Organization" and (2) whether the parties' subsequent performance added HIC as a party to the Michael Reese contract.

¶ 88    HIC responds that summary judgment was properly entered in its favor, as the uncontroverted evidence (including the parties' course of conduct after the 1991 amendment) showed that HIC became party to the Michael Reese contract. HIC maintains that the trial court correctly found it was a party to the Michael Reese contract, a "direct contract" that controlled the applicable reimbursement rates that HIC owed to Palos.

¶ 89    For the following reasons, we find there were genuine issues of material fact as to the meaning of the 1991 Amendment, as well as when the parties' subsequent conduct reflected an understanding that HIC was bound to the Michael Reese contract. We do find that the language of the 2005 and 2008 amendments established that HIC was bound by the time of the amendments' execution. Yet, fact questions remain as to whether HIC was *previously* bound to the Michael Reese contract. Thus, we reverse the entry of summary judgment for HIC and remand for further proceedings consistent with this opinion.

¶ 90                            Standard of Review

¶ 91    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "Our supreme court has explained that a genuine issue of material fact exists where the material facts are disputed or, if undisputed, where reasonable persons could draw different inferences from the undisputed facts." *Council for Jewish Elderly v. Kurtz*, 2024 IL App (1st) 230102, ¶ 36 (citing *Monson v. City of Danville*, 2018 IL 122486, ¶ 12).

¶ 92    When parties file cross-motions for summary judgment, "they agree that only a question of law is involved and invite the court to decide the issues based on the record." *Morningside North Apartments I, LLC v. 1000 N. LaSalle, LLC*, 2017 IL App (1st) 162274, ¶ 11. "However, the filing of cross-motions for summary judgment does not establish that there is no genuine issue of material fact, or obligate a court to render summary judgment." *Id.*

¶ 93    We are mindful that summary judgment is a "drastic remedy." *Council for Jewish Elderly*, 2024 IL App (1st) 230102, ¶ 35. "A court must therefore be cautious in awarding summary judgment 'in order to avoid preempting a litigant's right to a trial in which the litigant may fully present the factual basis of his or her case.' " *Id.* (quoting *Schuster v. Occidental Fire & Casualty Co. of North America*, 2015 IL App (1st) 140718, ¶ 16). "[I]f the record reveals a dispute as to any material issue of fact, summary judgment must be denied, regardless of the lower court's belief that the movant would or should prevail at trial." (Internal quotation marks omitted.) *Id.* ¶ 36. We review a circuit court's decision to grant a motion for summary judgment *de novo*. *Id.* ¶ 33.

¶ 94                    Applicable Contract Interpretation Principles

¶ 95    The parties agree that their dispute largely stems from the interpretation of the 1991 amendment to the Michael Reese contract, which referred "to members enrolled in Humana Health Care Plans Preferred Provider Organization" without defining that entity. Thus, we review the principles of contract interpretation.

¶ 96    "In construing a contract, a court's primary objective is to give effect to the intention of the parties. [Citation.] We look first to the language of the contract to determine the parties' intent." *Morningside North Apartments I*, 2017 IL App (1st) 162274, ¶ 15. "If the language of the contract is facially unambiguous, we interpreted both its meaning and the intent of the parties as a matter of law *** without resorting to extrinsic evidence. [Citation.] However, if the language of the

contract is reasonably susceptible to more than one meaning, it is ambiguous." *Id.* Whether contract language is ambiguous is a question of law. *Id.*

¶ 97    "If the terms of an alleged contract are ambiguous or capable of more than one interpretation *** parol evidence is admissible to ascertain the parties' intent." *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288 (1990). " '[T]he intended meaning of ambiguous contract language may be derived from the circumstances surrounding the formation of a contract or from the conduct of the parties subsequent to its formation.' " *Shapich v. CIBC Bank USA*, 2018 IL App (1st) 172601, ¶ 22 (quoting *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 102).

¶ 98            The Court Could Consider Extrinsic Evidence to Address an Ambiguity

¶ 99    At this point, it is appropriate to address two threshold claims of error by Palos. First, Palos maintains that "because the 1991 Amendment unambiguously did not add HIC as a party," the trial court could not consider extrinsic evidence. Palos additionally suggests that after the trial court determined there was a contractual ambiguity, it was barred from entering summary judgment because any ambiguity must be resolved by a jury. We disagree with Palos on both grounds.

¶ 100    First, we conclude there was an ambiguity in the 1991 amendment. In it, Palos "agrees to provide medical services as defined in [the Michael Reese contract] to members enrolled in Humana Health Care Plans Preferred Provider Organization, ('PPO')." The term "Humana Health Care Plans Preferred Provider Organization" was not defined or explained in the amendment. For example, nothing in the text of the amendment indicated whether this was the legal name of a Humana-affiliated entity, a trade name referring to an already-existing entity, or perhaps a reference to an entity that was merely contemplated but not yet formally in existence. Certainly,

we think this phrase was "reasonably susceptible to more than one meaning." *Morningside North Apartments I*, 2017 IL App (1st) 162274, ¶ 15. Moreover, the 1991 amendment was executed by "Humana Health Plans, Inc.," but did not have any language explaining the relationship between that entity and "Humana Health Care Plans Preferred Provider Organization." Thus, we find the 1991 amendment was ambiguous.

¶ 101     This brings us to Palos's suggestion that, upon finding a contractual ambiguity in the 1991 amendment, the court was precluded from granting summary judgment. Our case law says otherwise. This court has explained: "[O]rdinarily, where contract language is ambiguous, and therefore must be decided on the basis of extrinsic evidence, summary judgment is inappropriate." *William Blair & Co., L.L.C. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 342 (2005). However, "several cases have distinguished this general rule and held that if the extrinsic evidence available to construe ambiguous language is not in dispute, a court may, nevertheless, properly decide the issue as a question of law, as no question of fact is raised." *Id.* That is, "even if a contract is ambiguous on its face, summary judgment may nevertheless be appropriate if, predicated on the extrinsic submissions of the parties, no material issue of fact remains in dispute." *Id.*; see *Richard W. McCarthy Trust v. Illinois Casualty Co.*, 408 Ill. App. 3d 526, 535-36 (2011) (an "exception to the general rule applies and summary judgment may be granted [if] the extrinsic evidence submitted by the parties leaves no genuine issue of material fact in dispute").

¶ 102     In short, summary judgment may be appropriate, despite a contractual ambiguity, "if the parties' intent can be determined solely from facts not in dispute," including extrinsic evidence. *Gomez v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 130568, ¶ 24. Thus, the mere existence of a contractual ambiguity did not preclude the trial court from entering summary judgment, but it

could do so only if the extrinsic evidence established that there was no genuine issue of material fact.

¶ 103    Here, the entry of summary judgment in HIC's favor (and the denial of Palos's motion to reconsider) depended largely on the trial court's determination that extrinsic evidence established that HIC and Palos had a direct contract, after execution of the 1991 amendment. Notably, the court's remarks in granting summary judgment indicated it found no genuine factual dispute that HIC was being referenced when the 1991 amendment referred to the "Humana Health Care Plans Preferred Provider Organization." Upon Palos's motion to reconsider, the trial court apparently agreed with HIC's secondary argument that even if the 1991 amendment did not bind HIC *at that time*, the parties' subsequent conduct demonstrated that HIC became party to the Michael Reese contract.

¶ 104    We disagree with the trial court. Rather, we think the record presented genuine issues of fact as to *both* (1) the intended meaning of the 1991 amendment and (2) whether HIC became party to the Michael Reese contract through the parties' conduct *before* the subsequent 2005 and 2008 amendments explicitly referencing HIC. Accordingly, summary judgment (for either party) was inappropriate.

¶ 105    There Was a Genuine Issue of Material Fact Regarding the Meaning of the 1991 Amendment

¶ 106    First, we think it is apparent that the evidence in the record presents a genuine issue of material fact as to the intended meaning of the 1991 amendment to the Michael Reese contract. As discussed, the amendment included an ambiguous reference to "Humana Health Care Plans Preferred Provider Organization." In granting summary judgment, the trial court found that this phrase could only have been a reference to HIC. We disagree.

¶ 107       We acknowledge that HIC witnesses, namely Maxwell, submitted sworn testimony that HIC was the only Humana preferred provider organization at the time. Thus, Maxwell believed that the 1991 amendment must have been referring to HIC. Notably, however, Maxwell did not claim to have personal knowledge of the origin of the 1991 amendment.

¶ 108       Significantly, Palos witness Manchester testified to his personal involvement concerning the 1991 amendment and gave a very different explanation of its purpose and meaning. He testified, in essence, that the amendment was intended to provide coverage for a limited group of City of Chicago employees who desired a PPO option, rather than an HMO. In his words, the intent of the amendment was to "piggy back this very specific group into the [Michael Reese] contract," which was otherwise an HMO contract. Manchester denied any discussion that "Humana Health Care Plans Preferred Provider Organization" was meant as a trade name for HIC. He also denied any discussion that the amendment "would allow in any other PPOs."

¶ 109       Manchester's recollection of the July 1991 amendment's limited purpose is consistent with his notes from a March 1991 meeting, in which Manchester recorded that HHP—which had recently acquired Michael Reese—told Palos its plan to develop a PPO with "hopes to enroll government employees and their dependents." Palos witness Stefo similarly testified at trial to his understanding that the 1991 amendment was intended merely to allow "a very narrow county and city employee group to access *** the Michael Reese Health Plan HMO rates under their PPO."

¶ 110       No other witness with personal knowledge of the negotiation of the 1991 amendment testified, let alone contradicted Manchester's account. Based on his testimony, we certainly think the record presented a genuine issue of fact as to the intent behind the 1991 amendment's reference to "Humana Health Care Plans Preferred Provider Organization."

¶ 111      The Parties' Subsequent Conduct Also Presents Issues of Fact That Preclude

Summary Judgment in Favor of Either Party

¶ 112      Our analysis cannot end there, however. Notably, Palos argues that it is entitled to summary judgment—even assuming *arguendo* that HIC was the "Humana Health Care Plans Preferred Provider Organization" entity referred to in the 1991 amendment—because the amendment was facially insufficient to bind HIC. That is, even assuming the 1991 amendment *referred to* HIC, Palos asserts that it could not *bind* HIC to the Michael Reese contract. Palos points out that the amendment was signed by "Humana Health Plans, Inc." (HHP), not by HIC. Palos also argues the amendment "contained no contract formation language," that is, "elements of contract formation (offer, acceptance, and consideration) evidencing a meeting of the minds." Palos cites the proposition that a valid contract modification "must satisfy all the criteria essential for a valid contract: offer, acceptance, and consideration." *International Business Lists, Inc. v. American Telephone & Telegraph Co.*,147 F.3d 636, 641 (7th Cir. 1998).

¶ 113      We recognize (as did the trial court) that the 1991 amendment was executed by HHP, not HIC. Indeed, at the motion to reconsider hearing, HIC's counsel essentially admitted that HHP could *not* unilaterally bind HIC to the Michael Reese contract. However, HIC took the position that the parties' subsequent conduct left no doubt that the parties understood and ratified that HIC was a party to the Michael Reese contract. In denying Palos's motion to reconsider, the trial court indicated its agreement that the parties' subsequent performance warranted summary judgment for HIC.

¶ 114      We find that, although subsequent performance is relevant evidence, the record in this case did not mandate summary judgment for either party in this case. We do find that the 2005 and

2008 amendments were unambiguous and bound HIC. Nonetheless, fact questions remain as to whether HIC was *previously* bound to the Michael Reese contract.

¶ 115     We agree with the general proposition that subsequent conduct may indicate an intent to be bound to a prior agreement. It is "well settled that a party may, by acts and conduct, indicate assent to the terms of a written contract and become bound by its provisions, even though the party has not signed it." *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 21 (citing *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383 (1988)); see *23-25 Building Partnership v. Testa Produce, Inc.*, 381 Ill. App. 3d 751, 756 (2008) ("If a document is signed by the party being charged, the other party's signature is not necessary if the document is delivered to that party and it indicates acceptance through performance." (citing *Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 891 (1995)). Indeed, the Seventh Circuit decision cited by Palos recognizes that "[a] contract is validly modified if the party which did not propose the changes *is shown to acquiesce in the modification through a course of conduct consistent with acceptance*." (Emphasis added). *International Business Lists, Inc.*,147 F.3d at 641.

¶ 116     These authorities indicate that the court was free to consider extrinsic evidence of the parties' subsequent conduct as indicative of whether HIC was made party to the Michael Reese agreement, even if HIC was not a signatory to the 1991 amendment. In denying the motion to reconsider, the trial court apparently found this evidence showed no genuine issue of fact as to the parties' understanding that HIC had become a party to the Michael Reese contract, from the time of the 1991 amendment forward.

¶ 117     We reach a different conclusion. The evidence of subsequent performance was not so convincing as to establish the absence of *any* genuine issue of material fact. In the trial court, HIC essentially argued the evidence showed that since 1991, HIC paid millions of dollars to Palos to

reimburse it for PPO claims, without any complaint from Palos until the 2004 letter. Close scrutiny of the evidence, however, shows that it does not foreclose any issue of material fact as to whether HIC became bound before it was explicitly mentioned in the 2005 and 2008 amendments.

¶ 118     First, the evidence of HIC's prior payments did not establish that, since the 1991 amendment, Palos knowingly accepted reimbursements for PPO claims at the rates under the Michael Reese contract.

¶ 119     HIC heavily relied on evidence of payments made to Palos from 2000 forward, including Poynter's testimony that from 2000 to 2002, HIC paid claims totaling $4 million to $5 million. We think it is significant that HIC does not offer specific evidence as to payments made under the Michael Reese contract for the previous nine years since the 1991 amendment, *i.e.* from 1991 to 1999. This is a significant gap in the overall evidence of the parties' course of conduct since that amendment was executed. Certainly, a reasonable juror might find the absence of such evidence casts doubt on HIC's assertion that, since 1991, Palos consistently acted as if the Michael Reese contract governed.

¶ 120     Moreover, even Poynter's testimony about the payments made from HIC from Palos was not dispositive; it arguably raised additional questions of fact. Poynter was equivocal when the court asked her to specify the basis for her understanding that the Michael Reese contract took precedence over the ChoiceCare contract. When the court asked Poynter to specify what she relied on for this belief, she answered: "Honestly, years of experience with Humana. That's just something I know that the Humana direct deal always takes precedence over the ChoiceCare lead contract." She admitted she was not aware of a particular document that supported this understanding.

¶ 121    Furthermore, although Poynter testified to her understanding that HIC was paying Palos pursuant to the Michael Reese contract, she did not state that this was ever communicated to Palos. Similarly, her affidavit did not state that HIC explicitly referenced the Michael Reese contract when it sent Palos documentation of its claim reimbursements. At most, she indicated that the reimbursement rates could be discerned from that documentation, suggesting that Palos could have figured out that it was being paid at the Michael Reese contract rates. Yet, that is distinct from saying that Palos actually knew and understood that it was being paid pursuant to the Michael Reese contract.

¶ 122    On this point, Palos elicited evidence indicating that it did *not* have reason to know which contract HIC was operating under when Palos received reimbursements. Phyllis Marazzo, who served as Palos's director of patient financial services, testified at the 2018 trial. She stated that when Palos contacted insurers to verify insurance coverage benefits information for patients, the insurer did not tell Palos which specific contract the insurer was paying under.

¶ 123    Further, the samples of reimbursement documentation in the record are consistent with Palos's assertion that "[e]ven upon receiving reimbursement, Palos could not accurately determine the patient's specific managed-care plan." The record indicates that Palos received documentation that was labeled as coming from the "Humana Claims Office" but did not specify HIC as the Humana entity at issue. Nor did such documentation refer explicitly to the Michael Reese contract.

¶ 124    Further, Stefo (the author of Palos's 2004 letter) testified that from 2002 to 2004, the applicable reimbursement rates under the Michael Reese contract and the ChoiceCare contract were identical. This provides a plausible explanation why it was not until 2004 (two years after the ChoiceCare contract) that Palos first realized that HIC was taking advantage of the lower Michael Reese reimbursement rates, instead of the ChoiceCare contract rates.

¶ 125        In our view, this evidence certainly raised fact questions as to whether the parties' conduct was sufficient to find that HIC was bound to the Michael Reese contract through the 1991 amendment—at least *before* any subsequent amendments explicitly referenced HIC.

¶ 126        The Plain Language of the Amendments Establishes That HIC Was Made a Party to the Michael Reese Contract by 2005 but Does Not Resolve if HIC Was Already a Party

¶ 127        This brings us to the impact of subsequent amendments to the Michael Reese contract. Significantly, it is undisputed that amendments to the Michael Reese contract in 2005 and 2008 explicitly named HIC as one of the Humana entities thereto. The amendments recited that they were agreed to by Palos and a number of Humana entities, including "HUMANA Insurance Company." Notably, both of these amendments were executed during the contested period (2004 to 2010) for which Palos alleges it was underpaid. Thus, they cannot resolve whether HIC was bound for the entire disputed period. In turn, they cannot establish that HIC was entitled to summary judgment. However, we find they establish that HIC became a party by the time of the execution of the 2005 amendment.

¶ 128        Palos argues that because the 2005 and 2008 amendments' only explicit references to HIC occur within the amendments' recitals, such references are nonbinding. Palos cites the principle that a preliminary recital is not binding until it is referred to in the "operative portion of the instrument." *Illinois Housing Development Authority v. M-Z Construction Corp.*, 110 Ill. App. 3d 129, 144-45 (1982). We find this argument unavailing since (as HIC points out) the recitals at issue listed the entities subsequently referred to under the collective term "HUMANA," which appeared in the operative provisions of the amendments. That is, the recitals were incorporated into the rest of the amendments whenever "HUMANA" was mentioned.

¶ 129     Palos also refers to extrinsic evidence that the recitals were boilerplate language inserted by Humana. It notes the 2018 trial testimony of Gordon, Humana's former contract executive from 2006 to 2011, that he received templates for contractual amendments "from corporate" in Louisville, Kentucky. Palos thus suggests the "prefatory" recital language referring to HIC is insignificant.

¶ 130     We must disagree, because the recitals are unambiguous in referring to "HUMANA Insurance Company" as one of the several bound entities that are collectively defined as "HUMANA." As there is no ambiguity in the recitals, extrinsic evidence cannot be relied upon by Palos to undermine or alter their terms.

¶ 131     Moreover, it is undisputed that Palos executives had full opportunity to review the amendments, including the recitals at issue. Thus, Palos cannot avoid the import of their plain language. "One is under a duty to learn, or know, the contents of a written contract before he signs it, and is under a duty to determine the obligations which he undertakes by the execution of a written agreement." *Leon v. Max E. Miller & Son, Inc.*, 23 Ill. App. 3d 694, 699 (1974). The 2005 and 2008 amendments thus demonstrate that, by the time of their execution, Palos recognized that HIC was party to the Michael Reese contract.

¶ 132     In turn, we conclude that the amendments establish that, at least by the execution of the 2005 amendment, HIC was party to the Michael Reese contract. That is, at least as of the 2005 amendment, the Michael Reese contract was a direct contract with Palos of the sort contemplated by paragraph IV.E of the Payor Agreement and section 13.6 of the ChoiceCare contract. Under those provisions, HIC was entitled to take advantage of the lower reimbursement rates in the direct agreement, the Michael Reese contract.

¶ 133  Importantly, however—since the contested period at issue began in 2004—this conclusion does not warrant summary judgment in HIC's favor. This is because fact questions remain as to whether the parties earlier indicated their understanding that HIC was a party to the Michael Reese contract, either through the 1991 amendment or subsequent conduct.

¶ 134  Thus, we hold that (1) the evidence established that HIC was a party to the Michael Reese contract as of the execution of the 2005 amendment and thereafter but (2) triable questions of fact remain as to whether HIC previously became a party to the Michael Reese contract. Because genuine issues of fact remain, summary judgment was improper.

¶ 135           CONCLUSION

¶ 136  For the foregoing reasons, we reverse the circuit court orders granting summary judgment to HIC and denying Palos' motion to reconsider. We remand for the trial court to conduct further proceedings consistent with the conclusions reached in this opinion.

¶ 137  Reversed and remanded.

*Palos Community Hospital v. Humana Insurance Co.*, **2025 IL App (1st) 231917**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2022-L-2971; the Hon. Jerry A. Esrig, Judge, presiding. |
| **Attorneys for Appellant:** | Everett J. Cygal, Catherine M. Masters, Rachel A. Remke, and Jasmine K. Dela Luna, of ArentFox Schiff LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Scott C. Solberg, James W. Joseph, and Stuart F. Primack, of Eimer Stahl LLP, of Chicago, for appellee. |